# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 24-0804V**

ISAK LADEGAARD,

Petitioner,

v.

SECRETARY OF HEALTH AND HUMAN SERVICES,

Respondent.

Chief Special Master Corcoran

Filed: June 30, 2026

*Elizabeth Ellis Simek, Shannon Law Group, Woodridge, IL, for Petitioner.*

*Margaret Armstrong, U.S. Department of Justice, Washington, DC, for Respondent.*

## RULING ON ENTITLEMENT[1]

On May 23, 2024, Isak Ladegaard filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that he suffered a left shoulder injury related to vaccine administration ("SIRVA"), a defined Table Injury, after receiving tetanus, diphtheria, acellular pertussis ("Tdap") vaccine[3] on October 31, 2022. Petition at 1, ¶¶ 5, 26.

[1] Because this Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

[3] Petitioner also received an influenza ("flu") vaccine in his left deltoid but alleges that his SIRVA is due to the Tdap vaccine only. *See* Ex. 3 at 5 (vaccine record). Both vaccines are covered by the Program, and there is a Table SIRVA listed for the tetanus toxoid, pertussis component, and flu vaccine. 42 C.F. R. § 100.3(a)(I)(C), (II)(C) & (XIV)(B) (2017).

Petitioner further alleged that his "left shoulder SIRVA injury, which caused him pain and impairment for a period lasting longer than six months." *Id.* at ¶ 20; *accord.* Ex. 1 at ¶ 22 (Petitioner's declaration).[4]

The parties dispute whether the "severity requirement" that all Program claims must satisfy has been met. For the reasons set forth below, I find that Petitioner likely suffered the residual effects of his SIRVA for more than six months,[5] and he has met the other requirements of a compensable Table SIRVA injury. Petitioner is thus entitled to compensation under the Vaccine Act.

## I. Finding of Fact Regarding Duration of Residual Effects/Severity

At issue is whether Mr. Ladegaard has provided the preponderant evidence needed to establish that he suffered the residual effects of his alleged SIRVA for more than six months. Section 11(c)(1)(D)(i).

### A. Authority

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs*., 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs*., No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. "Written records which are, themselves, inconsistent, should be

---

[4] This declaration was signed on June 11, 2024, under penalty of perjury as required by 28 U.S.C.A. § 1746. Ex. 1 at 7, ECF No. 7-2.

[5] Petitioner does not allege, nor would the evidence support, either alternative to establishing the severity requirement: that the alleged injury resulted in death, or "inpatient hospitalization and surgical intervention." Section 11(c)(1)(D)(ii), (iii). Rather, this case turns on Petitioner's inability to prove six months of post-onset sequelae. *See* Section 11(c)(1)(D)(i).

accorded less deference than those which are internally consistent." *Murphy v. Sec'y of Health & Hum. Servs.*, No. 90-882V, 1991 WL 74931, *4 (Fed. Cl. Spec. Mstr. April 25, 1991), quoted with approval in decision denying review, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed.Cir.1992)). And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs*., 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs*., 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs*., No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such fact testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs*., 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs*., 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

### B. Analysis

I make this finding after a complete review of the record, which includes all medical records, affidavits or declarations, and additional evidence filed. Specifically, I highlight the following:

- During the three years prior to vaccination, Mr. Ladegaard (a college professor in Chicago, Illinois)[6] sought medical care from his primary care provider ("PCP") on several occasions, for a gym injury sustained in 2019, affecting his neck, back, and left trapezius; and several unrelated and common medical conditions. Ex. 2 at 3-18; Ex. 13 at 26-31.

- In his initial declaration, Petitioner addressed a gap in his prior medical records, explaining that "[f]rom August 2020 until August 2021, [he] worked remotely from Melbourne, Australia." Ex. 1 at ¶ 3. In her declaration,[7] Petitioner's spouse (a college professor in Hong Kong) provided a detailed explanation how the couple met in South Korea in 2008; married in 2013; and lived together in Boston from 2013 through 2019, in Chicago during the Fall of 2022 (when Petitioner sustained his alleged SIRVA), and since December 2023. Ex. 11 at ¶¶ 2-6, 9, 11.

- While attending graduate school in Boston on March 7, 2019, Petitioner sought treatment for "persistent left shoulder/upper back pain for about 6 weeks" that started after he failed to "put weights down with good control" when doing a shoulder press at the gym. Ex. 13 at 26. Describing "bad [pain] for 3-5 days" in his neck, followed by more moderate pain in his left trapezius, he reported a lack of further improvement, despite rest. *Id.*

- Assessing Petitioner with "[s]prains and strains of [the] thoracic, the PCP provided him with Ibuprofen and a home exercise program ("HEP") and instructed him to modify his activity and return if the symptoms continued or worsened. Ex. 13 at 30.

---

[6] Petitioner is a citizen of Norway. Ex. 13 at 13.

[7] Like Petitioner's declaration, his spouse's declaration was signed under penalty of perjury as required by 28 U.S.C.A. § 1746. Ex. 11 at 5, ECF No. 18-2. It was dated March 20, 2025. *Id.*

- On December 10, 2021, Petitioner received a COVID-19 vaccine, administered intramuscularly in his left deltoid. Ex. 17 at 2-3. He reported no problems associated with this vaccination.

- On September 28, 2022, approximately one month before receiving the Tdap vaccine alleged as causal, Petitioner again sought care for the pain he experienced after the gym incident in 2019. Ex. 5 at 17-23, 28-31. He attended physical therapy ("PT") for neck pain that "started hurting in 2019[8] after dropping a weight too quickly at the gym." Ex. 5 at 17. He reported that the accident "pulled traction on his L UE" (*Id.*), that his symptoms worsened when "putting his head forward" (*id.* at 30), and that a simultaneous wrist injury had resolved (*id.* at 31). Estimating his current pain level as one and five at its worst (*id.* at 22), Petitioner listed the steps he had taken to reduce his symptoms, for example, exercises, stretching, and sleeping on his back (*id.* at 21, 30) but "ha[d] hit a plateau" (*id.* at 21).

- The therapist assessed Petitioner as suffering the "the signs and symptoms of L cervical strain, . . . poor shoulder/neck posture, limited cervical flexion/R SB/R[9] rot[ation], and increased TTP[10] in L UT." Ex. 5 at 19. Opining that Petitioner "ha[d] excellent rehab potential" (*id.*), the therapist recommended twice weekly PT sessions for six weeks (*id.* at 20).

- At his subsequent two PT sessions on October 11 and 13, 2022, Petitioner reported feeling about the same and not too sore after PT. Ex. 5 at 13, 15. In the records from both sessions and on the discharge summary completed December 16, 2022, it was noted that he had met both his long-term and short-term goals. *Id.* at 11, 14, 16.

- On October 12, 2022, Petitioner received a second COVID-19 vaccine, administered intramuscularly in his left deltoid. Ex. 17 at 2-3. He reported no problems associated with this vaccination.

- On October 31, 2022, Petitioner (then 36 years old) received Tdap and flu vaccines at his PCP's clinic, both administered intramuscularly in his left deltoid. Ex. 3 at 4-5. In his declaration, Petitioner recalled feeling "the usual

---

[8] In this record, Petitioner provided a slightly later onset date of September 1, 2019. *Compare* Ex. 5 at 21 *with* Ex. 13 at 29 (identifying a pain onset in mid-January 2019).

[9] Although the exact meaning of this abbreviation is unclear, it undoubtedly refers to some type of shoulder movement.

[10] TTP stands for tender to palpation. MEDICAL ABBREVIATIONS at 604 (16th ed. 2020).

amount of minimal discomfort" when receiving the flu vaccine but extreme pain during the administration of the Tdap vaccine. Ex. 1 at ¶ 7.

- Twelve days post-vaccination on November 12, 2022, Petitioner messaged his PCP, asking if it was normal to experience continued shoulder pain in response to the Tdap shot he received on October 31, 2022. Ex. 4 at 1. He replied in the negative when asked if his arm was swollen or red, adding that his pain had decreased from "5/5" to "3/5 or 2.5/5." *Id.* The nurse addressing Petitioner's concerns instructed him to let someone at the clinic know if "the pain doesn't resolve completely or if [he] notice[d] it increasing." *Id.*

- On December 18, 2022, Petitioner again messaged his PCP, stating that his pain continued and any improvement he had gained ceased two weeks ago. Ex. 4 at 2. The nurse responding to his message instructed him to make an appointment with the PCP or go to urgent care. *Id.*

- When seen by the PCP four days later (on December 21, 2022), Petitioner reported that his Tdap vaccine "hurt more than usual, "that the shoulder pain "ha[d] improved but not resolved completely," and that his pain intensity was three out of ten. Ex. 2 at 19. Observing "mild tenderness on palpitation of the left deltoid" and reduced range of motion ("ROM"), the PCP provided Petitioner with an orthopedic surgery referral, prescribed cyclobenzaprine[11] and meloxicam[12] and instructed him to apply Voltaren gel as needed. Ex. 2 at 19, 21.

- On that same day, Petitioner underwent a PT evaluation at the same clinic where he received treatment for his neck and back pain. Ex. 5 at 4-7. He again linked his left shoulder to the vaccine he received. *Id.* at 4, 6.

- Noting that Petitioner "present[ed] with pain, decreased motion, impaired strength which limit[ed] him functionally" (*id.* at 6), the therapist assessed his rehabilitation potential to be excellent and recommended twice weekly PT sessions for four weeks. *Id.* at 6-7. In a letter to Petitioner's PCP, the therapist stated that Petitioner "would follow up once he feels ready." *Id.* at 10.

---

[11] Cyclobenzaprine hydrochloride is "a compound structurally related to the tricyclic antidepressants; used as a skeletal muscle relaxant for relief of painful muscle spasms; administered orally." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY ("DORLAND'S") at 455 (32th ed. 2012).

[12] Meloxicam is "a nonsteroidal anti-inflammatory drug used in the treatment of osteoarthritis; administered orally. DORLAND'S at 1126.

- After attending only the initial PT evaluation, Petitioner self-discharged on January 25, 2023. Ex. 5 at 3. It was noted that he declined further treatment and was provided a HEP. *Id.*

- Less than three weeks later on February 14th, Petitioner messaged his PCP's clinic, reporting continued left shoulder pain from the Tdap vaccine he received on October 31, 2022, and requesting a referral to an orthopedist covered by his insurance. Ex. 4 at 3. The responding nurse asked that he confirm coverage of the orthopedic surgeons in the Chicago area with his medical insurance carrier, adding that a referral then could be provided. *Id.*

- On March 3, 2023, Petitioner attended an orthopedic visit for evaluation for left shoulder pain after receiving a Tdap vaccine in October 2022. Ex. 7 at 20. Reporting taking anti-inflammatories and engaging in PT "in the past prior to this vaccination but no recent physical therapy in the setting of the symptoms," he described significant pain for approximately four to five days that subsided but continued to cause "difficulty with overhead movements and activities secondary to pain in the shoulder." *Id.*

- Assessing Petitioner as suffering from "[l]eft subacromial bursitis secondary to previous vaccination into potentially the bursa which is still lingering and . . . caus[ing] relative weakness," the orthopedist administered an ultrasound-guided subacromial injection, recommended PT, and instructed Petitioner to return to the clinic and possibly undergo an MRI if no improvement was gained. Ex. 7 at 21; *see id.* at 22-31 (for additional details related to the steroid injection).

- On March 7, 2022, it appears Petitioner sent his spouse (now living and working in Hong Kong) a text message, informing her that his shoulder was "much better now" after receipt of a steroid injection last week. Ex. 12 at 1. He added that he was "exercising every day again." *Id.*

- On April 15, 2023, Petitioner scheduled another appointment with his orthopedist, seeking a second cortisol shot because his shoulder pain had returned. Ex. 7 at 5. He reported that his pain was "better than it was before [his] first visit . . . [that he] exercised a lot, [and that he was] not sure what to do next." *Id.* In his supplemental declaration,[13] Petitioner stated that the appointment was scheduled for April 21, 2023. Ex. 15 at 7.

---

[13] Petitioner's supplemental declaration was signed on July 18, 2025, under penalty of perjury as required by 28 U.S.C.A. § 1746. Ex. 15 at 3, ECF No. 18-2.

- On April 18, 2023, a nurse from the clinic contacted Petitioner, stating that she saw his scheduled appointment and wanted to inform him that he could not receive another cortisone injection for three months. Ex. 8 at 1. The nurse suggested the orthopedist could order an MRI and Petitioner could "follow up afterward to discuss the results." *Id.* She also asked if he had started PT. *Id.*

- In his April 19, 2023 response, Petitioner confirmed that he would like to proceed with the MRI, but wanted to ensure it would be "covered by [his] insurance." Ex. 8 at 1. He added that he "ha[d] gone to physical therapy once, and have followed exercise tips on a near-daily basis since [his] last visit." *Id.*

- The next day, the nurse replied that the orthopedist would enter the order for an MRI at some time that day. Ex. 8 at 1. She instructed Petitioner to share his medical insurance information when scheduling the MRI, noting he then would be told if the procedure would be covered. *Id.*

- On April 21, 2023, Petitioner asked if he needed to cancel the appointment he made on April 15, 2023. Ex. 8 at 1-2. The nurse informed him she would cancel the appointment for him. *Id. Id.* at 2.

- In their declarations, Petitioner and his wife described the symptoms Petitioner experienced and their effects. Ex. 1 at ¶¶ 7-9, 18-20; Ex. 11 at ¶¶ 8, 10, 12; Ex. 15 at ¶ 8. Noting that they reconciled and began living together in December 2023, Petitioner and his spouse insisted that he continued to suffer symptoms - described as a pain level of four out of ten, but acknowledged to be manageable. Ex. 1 at ¶ 20; Ex. 11 at ¶¶ 11-12; Ex. 15 at ¶¶ 8-9.

- Petitioner also provided reasons why he failed to pursue additional PT, the ordered MRI, and a second steroid injection. Ex. 1 at ¶¶ 14, 16-18; Ex. 15 at ¶¶ 6, 8. He stressed his preference to rely on a HEP instead of formal PT, his recollection that the orthopedist did not believe an MRI would be helpful, the difficulties he encountered determining if the cost of the MRI would be covered by insurance, his marital difficulties, and the more manageable levels of the pain he experienced in late summer 2023, and later. *Id.*

To satisfy the Vaccine Act's severity requirement in this case, Petitioner must show that he suffered symptoms of his alleged SIRVA beyond April 30, 2023 (assuming a same day onset which the record preponderantly supports). Although the residual effects of his SIRVA may be intermittent or mild, he must show they continued to some extent through at least that date.

Emphasizing Petitioner's lack of treatment after March 2023 and decision not to undergo an MRI, Respondent argues that "Petitioner has not established that he suffered from his alleged SIRVA injury for more than six months post-vaccination." Rule 4(c) Report at 8. He maintains Petitioner's affidavit should be afforded little weight because it represents Petitioner's claims alone and is "inconsistent with the medical records". *Id.* Specifically, he insists that Petitioner's claim that his orthopedist agreed an MRI was not needed runs counter to the orthopedist's statement, made on March 3, 2023, that an MRI would be helpful if Petitioner's pain did not improve. *Id.* at 9.

Although Petitioner last visited his orthopedist on March 3, 2023, he continued to seek additional treatment and report ongoing symptoms during communications with his orthopedist's clinic through at least April 20, 2023 - 10 days prior to the six-month mark. On April 15, 2023, he scheduled a follow-up appointment because his shoulder pain had returned following temporary relief gained from a steroid injection administered on March 7, 2023. Ex. 8 at 1. After being informed he could not yet receive another steroid injection as requested, Petitioner agreed to undergo an MRI. *Id.* And he asked that his appointment (scheduled for April 21, 2023) be canceled, *only after* this treatment change. *Id.* at 2. These communications show Petitioner's left shoulder pain continued at least through April 19, 2023, when he agreed to undergo an MRI.

Even though Petitioner's symptoms throughout his injury course were relatively mild, it is unlikely that his SIRVA would have resolved completely before the end of the April 2023 – especially given the absence of treatment which would have provided quick relief, such as a second steroid injection. At most, because Petitioner would have been eligible for another injection in late summer 2023, it can be surmised that his symptoms ended, or at least greatly diminished prior to that time (but after the end of April). Although his failure to pursue the planned MRI signals an earlier symptom reduction, it also could be attributed to problems with his medical insurance coverage - clearly a concern for Petitioner[14] - or the mild nature of the symptoms he was experiencing.

[14] When requesting an orthopedic referral in February 2023, and an order for an MRI in April 2023, Petitioner requested assurances that the treatment would be covered by his medical insurance. Ex. 4 at 3; Ex. 8 at 1. In his supplemental declaration, he stated that he "found it overwhelming to navigate the insurance process to confirm whether an MRI would be covered", due to his marital problems at the time, unfamiliarity with the American healthcare system, and attention deficit disorder. Ex. 15 at ¶ 8.

Undergoing an MRI, which unlike a steroid injection is designed to diagnosis, not treat, Petitioner's pain, requires more significant follow-through. As his decision to forego further PT in January 2023 illustrates, Petitioner did not always follow his medical provider's guidance, often selecting his preferred treatment, such as a HEP rather than formal PT. And he clearly contacted his orthopedist in April, not to obtain the earlier mentioned MRI, but to obtain a second steroid injection. Therefore, Petitioner's failure to undergo the planned MRI is not as significant as Respondent portends – although it does signify a lack of symptom severity.

Overall, the record in this case supports the conclusion that Petitioner's SIRVA-related symptoms, even though mild enough to warrant only conservative treatment for less than six months, likely continued through at least the end of April 2023 if not a bit beyond. Accordingly, I find there is preponderant evidence to establish Petitioner suffered the residual effects of his alleged SIRVA for more than six months (although as noted above the same evidence supports the view that Petitioner's injury was not notably severe for purposes of calculating damages).

## II. Additional Requirements for Entitlement

### A. Legal Standards

In addition to requirements concerning the vaccination received, the duration of petitioner's injury (discussed above in Section I), and the lack of other award or settlement,[15] a petitioner must establish that she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a Tdap vaccine. 42 C.F. R. § 100.3(a)(I)(C) & (II)(C). The criteria establishing a SIRVA under the accompanying Qualifications and Aids to Interpretation ("QAI") are as follows:

[15] In summary, a petitioner must establish that she received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of her injury for more than six months, died from her injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury. *See* Section 11(c)(1)(A)(B)(D)(E).

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:
>
> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>
> (ii) Pain occurs within the specified time frame;
>
> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and
>
> (iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

### B. Analysis

Respondent has identified no further objections to compensation,[16] and I find Petitioner has otherwise satisfied all criteria for a Table SIRVA injury following receipt of the Tdap vaccine. Although Petitioner sustained a prior gym injury which resulted in pain located in his neck, back, and left trapezius, there is no evidence of prior left shoulder

[16] Following a call in early May 2026, Respondent was given the opportunity to confirm, as illustrated by his Rule 4(c) Report, that he had no other objection to compensation, other than his belief Petitioner had failed to establish the required six-month severity. In a status report filed on May 22, 2026, Respondent stated he "does not have any other objections to entitlement at this time." ECF No. 32.

pain, inflammation, or dysfunction or an alternative cause that would explain Petitioner's post-vaccination left shoulder pain. Ex. 5 at 17-23, 28-31; Ex. 13 at 26-31; *see* 42 C.F.R. § 100.3(c)(10)(i), (iv) (first and fourth QAI criteria). And Petitioner experienced pain within 48 hours of vaccination and exhibited pain and limitations in ROM solely in his left, injured shoulder. *E.g.,* Ex. 2 at 19-21; Ex. 5 at 4-6; *see* 42 C.F.R. § 100.3(c)(10)(ii) & (iii) (second and third QAI criteria).

As I have determined in this ruling, the record supports a finding that Petitioner suffered the residual effects of his SIRVA for more than six months. *See* Section 11(c)(1)(D)(i) (the Vaccine Act's six-month severity requirement). Additionally, the vaccine record shows Petitioner received the Tdap vaccine administered at his PCP's clinic in Illinois. Ex. 3 at 4-5; *see* Section 11(c)(1)(A) (requiring receipt of a covered vaccine); Section 11(c)(1)(B)(i) (requiring administration within the United States or its territories). Additionally, there is no evidence that Petitioner has collected a civil award for his injury. *See* Section 11(c)(1)(E) (lack of prior civil award). Thus, Petitioner has satisfied all requirements for entitlement under the Vaccine Act.

## III. Appropriate Amount of Compensation

Although I have found Petitioner entitled to compensation, I do not expect the amount awarded for Petitioner's past pain and suffering to be significant in magnitude. The record shows Petitioner required only minimal conservative treatment and obtained good (if temporary) pain relief from the steroid injection administered in early March 2023, only four months post-vaccination. Despite Petitioner's assertion that his symptoms continued well beyond June 2023, there is no evidence, other than the assertions of Petitioner and his wife, to support the alleged ongoing sequela.

## Conclusion

**Based on the entire record in this case, I find that Petitioner has provided preponderant evidence satisfying all requirements for a Table SIRVA and the Vaccine Act's severity requirement needed for both Table and non-Table claims. Petitioner is entitled to compensation in this case.**

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master